**Opinion issued August 29, 2025**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-25-00186-CV

_____

## IN THE INTEREST OF D.L., A CHILD

---

**On Appeal from the 314th District Court**
**Harris County, Texas**
**Trial Court Case No. 2023-01908J**

---

## MEMORANDUM OPINION

Appellant J.L. ("Mother") appeals the trial court's final decree terminating her

parental rights to her son, D.L. ("David"),[1] arguing the trial court abused its

discretion by failing to grant a trial continuance and that the evidence was legally

---

[1] To protect the identity of the minor child involved in this case, we refer to him and the parties by fictitious names and initials. *See* TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.9.

and factually insufficient to support termination under section 161.001(b) of the Family Code. The alleged father, O.O. ("Father"), also appeals the termination of his parental rights to David, arguing the trial court abused its discretion by denying him a jury trial. We affirm.[2]

## I.    Background

### A.  Mother's prior history with the Department

Mother has five children, the youngest of whom is David. Before David was born, the Texas Department of Family and Protective Services ("the Department") conducted at least six separate investigations of abuse or neglect of Mother's other children which resulted in their being placed with a family member. The first of those was in 2011, when the Department received a report that Mother had been caught with drugs and was not providing proper care for her one-year-old child. Mother tested positive for marijuana, but the Department closed its case after a caseworker visited the children and saw no signs of abuse or neglect. In addition, Mother had family support, and she was participating in a substance abuse program.

In 2015, the Department received a report that Mother was smoking and selling "ice" and methamphetamines, with drug deals occurring in the home where she lived with her children. The reporter said Mother smoked marijuana in her

_____

[2]    The trial court's final decree also terminates the parental rights of the unknown father. Unknown father does not appeal.

children's presence, and that the children had access to marijuana on a daily basis. According to the reporter, Mother used drugs and drank heavily "for years," but "it ha[d] gotten worse" in the past few months as Mother began "smoking and snorting ice."

When the Department investigated these allegations, Mother admitted to using marijuana, Xanax, and cocaine, and she tested positive for marijuana, cocaine, amphetamines, methamphetamines, and benzodiazepines. The investigator wrote in her report that Mother was "very loud and combative," and Mother told the investigator she would take her children out of school and would "not participate or sign anything with the agency nor will she submit any of her urine or anything else to the agency." One of Mother's children told the investigator that Mother and her boyfriend smoke "green and brown stuff," and another said that there was smoke in the home but Mother "fans it out of the house."

At the conclusion of its investigation, the Department removed Mother's three children from the home, and a court entered an order placing them in the managing conservatorship of a relative. Mother's parental rights to the children were not terminated, but she was required to undergo staged drug testing for nine months before she would be allowed to visit them without supervision.

In 2017, six months after entry of the order removing Mother's children from her home, the Department received a report that Mother and a five-month-old child in her care were passengers in a vehicle that was pulled over by police for speeding at ninety-two miles per hour. The police found illicit drugs and drug paraphernalia in the vehicle. The driver of the vehicle claimed ownership of the drugs and was arrested; Mother was released with the child.

During the Department's investigation of this report, its investigator attempted to contact Mother at multiple addresses and telephone numbers but was unable to reach her. Several weeks into the investigation, a Department investigator made another visit to one of the addresses on file for Mother, where she encountered a woman. The investigator asked for Mother by name, and the woman said she did not know anyone by that name, and that no children lived at the residence. Later that day, the investigator spoke with the property manager, who confirmed Mother lived at that address with her child. When the investigator gave a description of the woman with whom she had spoken earlier in the day, the property manager said, "[t]hat is [Mother]," and then told the investigator Mother "had been changing her hair color so she would not be recognized." The property manager also showed the investigator a text exchange she had with Mother, in which Mother asked the property manager to "tell them . . . you went ahead and told us we were not allowed on property and can't stay there no more." When the

property manager responded, "[j]ust call them and keep us out of it," Mother wrote, she would "tell them we moved outta state." As she was leaving the property that day, the investigator saw what appeared to be Mother driving away from the residence with a child in the vehicle.

The Department sought a court order to assess the child's well-being and that required Mother to submit to drug testing. The Department later sought and obtained a dismissal of the case because "[t]he family's whereabouts are unknown."

Three years later, in 2020, the Department received a report regarding another of Mother's children who had been staying with her father. When Mother picked the child up, the child reported that she had been sexually assaulted by an unrelated member of the father's household. Mother took the child to the hospital. The Department closed its case after "[s]everal attempts to interview [Mother] and see the child were unsuccessful."

In 2021, the Department received a report that another of Mother's children had been staying with the child's paternal grandmother when Mother came to retrieve the child. The reporter told the Department that Mother was "using a lot of drugs" and "living in an abandoned house with no utilities" or sleeping in her car. According to the reporter, the child was going without food and "always crying," and Mother left the child alone or with "random people" while she went in

search of drugs. After an attempted investigation, the Department closed its case because "[t]he family has moved and all leads to locate and interview the family have been exhausted."

And finally, in 2022, the Department received a report that for several months, Mother had been living in an abandoned and condemned house with her five-year-old child, where Mother was "selling and using meth." The reporter said the house was without running water, such that "[t]hey are digging holes in the yard trying to get water." The reporter told the Department that there "is a lot of traffic (mostly men) in and out of the home"; that the reporter "believed [Mother] is getting high while [the child] is present"; and that the child is "always alone outside" and "is up and down the street."

During its investigation, a Department investigator made repeated attempts to reach Mother by telephone, text, and social media, but without success. The investigator also made a number of in-person visits to the residence, but no one answered the door or the person who did answer refused to speak with the investigator. On one such visit, the person who answered the door identified herself as Mother's mother and then told the investigator, "[y]ou people are ridiculous. . . . [W]e are not talking to y'all and no, you cannot see [the child]." The investigator also spoke with the owner of the property, who said the people living there were "squatters" and he had begun eviction proceedings. The

6

Department ultimately closed its investigation because it could not substantiate the reporter's allegations.

## B. Mother's criminal history

In 2003, Mother was adjudicated for aggravated robbery. In 2007, she received four years deferred adjudication for robbery, which she completed successfully. In 2010, Mother was convicted of theft and sentenced to twenty-five days in jail. In 2012, she was convicted of credit-card abuse and sentenced to ten days in jail. In 2013, she was convicted of assault on a family member and sentenced to ten days in jail.

In 2016, while the Department was investigating a report that Mother was using drugs and conducting drug deals in her home while her children were present (leading to entry of the order placing the children in the managing conservatorship of a relative), Mother was charged with possession of methamphetamine. The charge ultimately was dismissed when Mother's co-defendant was convicted, but police reports included within the record describe the events leading to the charge.

Specifically, police were dispatched to a house in response to a drive-by shooting. Mother was there with two men, one of whom was her boyfriend, and both of whom were gang members with felony convictions. Officers observed several bullet holes across the front of the house. They found spent casings on the street and inside the house. The men initially told the officers the shell casings

found inside the house came from the shooters, but when the officers responded that was impossible, one of men stated he had returned fire from inside the house. The officers recovered two handguns from under a bedroom mattress. Mother was "visibly shaken" and told the officers the shooters could have shot her children had they been with her that day.

The officers also found drugs inside the house. The first officer to arrive on the scene "smelled a strong odor of marijuana coming from the interior of the residence." When the officer asked about the smell, Mother said they "only had a small baggie" and handed him a cosmetic bag containing "a green leafy substance believed to be marijuana" and a pipe. But the officer continued to smell "a strong odor of marijuana coming from the kitchen," where he found "a white plastic grocery bag filled with smaller plastic baggies that contained [a] green leafy substance believed to be marijuana." When the officer inspected the bag more closely, he found three baggies that contained what he believed was "crystal meth." Chemical testing later confirmed the substance to be methamphetamines, leading to the charges against Mother.

C.    **Mother's hospital stay prior to David's birth**

David was born in the summer of 2023. Mother was admitted to the hospital a few days before the birth, complaining of contractions and a headache. During an initial exam, Mother tested positive for amphetamines and said she had used

marijuana three days prior, although her test for marijuana was negative.[3]  Mother also told the examining doctor she sells methamphetamines as a source of income, but she denied using them.  Doctors determined Mother had pregnancy-related high blood pressure and "newly diagnosed syphilis."

Mother had two prenatal doctor visits during her pregnancy, the second of which was three months before being admitted to the hospital.  Mother's medical records describe her prenatal care as "scant."  At the time of Mother's admission, doctors initially assessed David at thirty-four weeks of gestational age based on an ultrasound, but after he was born, concluded he was at thirty-seven weeks.

In light of the potential complications from Mother's elevated blood pressure, her syphilis, and the possibility of a premature birth, the obstetrician who was treating Mother in the hospital consulted with a neonatologist.  The neonatologist considered the baby's exposure to syphilis to be "the most concerning" factor because of Mother's "very, very limited prenatal care."  She testified that if a pregnant woman has untreated syphilis, her baby can develop a congenital syphilis infection that affects "every organ system," which could result in "skeletal abnormalities," "long-term neurologic abnormalities such as vision

---

[3]  Some of the medical records reflecting Mother's positive test for amphetamines say that these results "have not been confirmed by a second method and should be used for medical purposes only."  At trial, the neonatologist who treated David immediately after he was born testified that confirmatory tests are regularly done, but she did not know whether a confirmatory test for amphetamines had been performed on Mother.

loss, . . . hearing loss, [or] long-term disabilities," and "facial features that go along with the syphilis infection." The neonatologist explained that Mother's syphilis would have been diagnosed and treated with "proper prenatal care," in which case David "would not need the long-term treatment and long-term follow up as this baby would need."

The neonatologist visited Mother the day before David's birth to discuss her pregnancy and upcoming delivery. Mother complained the visit was "interrupting her rest," saying they could talk after the delivery. As the neonatologist began discussing the risks associated with delivery of a baby at thirty-four weeks, explaining that the baby could be in respiratory distress and would need treatment for syphilis exposure, Mother became angry, told the neonatologist the baby did not need to be delivered at that time, and said she did not have syphilis. Recognizing that Mother "did not want me there," the neonatologist left the room.

The neonatologist was also concerned about Mother's positive test for amphetamines. Amphetamines can be transferred from a pregnant woman to her baby, which could cause the baby to have an "amphetamine high" or suffer withdrawal symptoms after birth.

### D. David's birth and first days as a newborn

David weighed five pounds, twelve ounces at the time of his birth. Because he was small for his gestational age, and in light of his exposure to maternal

amphetamines and marijuana and the potential for congenital syphilis, David was sent to the neonatal intensive care unit ("the NICU"). David's medical records state that he "was seen and held by parents prior to transport to NICU." Doctors determined David would need to remain in the NICU for at least ten days.

David did not test positive for amphetamines. But within twelve hours of being admitted to the NICU, David became "very fussy" and "jittery," he was "not sleeping," and he began "sneezing" and showing signs of "congestion/stuffiness." The neonatologist who treated David immediately after he was born testified she had "no doubt" these were "mild withdrawal [symptoms] or the effects of the amphetamines that w[ere] in the baby's system." She explained that newborns can have amphetamines in their systems that do not show up on a drug test. David ultimately did not need medication to treat his withdrawal symptoms and was "treated symptomatically by comfort care by the nurses."

The doctors "suspected" but could not confirm that David was born with syphilis. As the neonatologist explained at trial, "the baby's test needed to be higher than mom by fourfold to be confirmed," but "in this baby's, it was a twofold increase from Mom's test, so, therefore, it is a . . . probable highly suspected syphilis. . . . It is highly probable and highly suspected." The doctors treated David for syphilis exposure and then monitored him for the first months of his life.

The doctors and nurses advised Mother not to breastfeed David due to the drugs in her system. She tried to do so anyway. The neonatologist testified that breastfeeding against medical advice would be "endangering conduct."

On the day of David's birth, a social worker employed by the hospital met with Mother to discuss her plans for caring for David and to make various resources available to her. When the social worker brought up Mother's positive amphetamine test, Mother became angry and asked whether the social worker was with "CPS." The social worker explained that while she did not work for Department, she was required by law to report Mother's positive drug test to the Department. Mother told the social worker she would not speak with the Department or answer any of its questions. Mother told the social worker she had four other children who had been removed by the Department, and she did not want David to be removed as well.

Mother then began removing her monitors and IV lines, tried to get out of bed, and said she was going to take David from the NICU and leave the hospital against medical advice. But Mother could not stand due to the medications she had been given, and she asked the social worker to leave her room. The social worker left without being able to discuss with Mother the resources available to help her, though the social worker did leave a packet of written materials for Mother. The social worker told the on-duty nurses about Mother's statements regarding her

intention to leave the hospital against medical advice, and they alerted hospital security and placed David on "no info" status, meaning that "if the mom had called up to the NICU, then we would say we don't have a baby here of that name."

Mother was later discharged from the hospital, but David remained in the NICU. A few nights after her discharge, Mother returned to the NICU at 11:15 p.m., notwithstanding that the hospital had put security measures in place to screen any family members. Mother was accompanied by her sister and six-year-old daughter. The nurse on duty that night described Mother's behavior as "odd" and "easily escalated," and she recorded in a note about the visit that "Mother's gait was unstable, she was jittery, [and] her voice kept cracking as she spoke." The nurse alerted security that Mother was there, and Mother "became increasingly agitated when she saw the officer," demanding to know why security is "always present." Mother told the nurse that someone "needs to come talk to me" and asked for an explanation as to why David remained in the NICU "if he's doing so well." The nurse explained David's continuing course of treatment and suggested Mother spend time with David while she was there, at which time Mother began to "calm slightly." Mother "briefly attempted skin to skin" but then put David in the six-year-old's arms. Mother left at 12:30 a.m., saying she would return after having something to eat. There is no indication in David's medical records that Mother returned that night.

13

Mother returned to the hospital a few nights later. Before she arrived, Mother told hospital staff she was coming to the hospital to take David home. By that point, the hospital had put additional security measures in place, including moving David to a special care unit with security guards around it and notifying other floors of the situation. When Mother got to the hospital, staff greeted her in the lobby and told her she would be unable to visit David in the NICU. Mother became "aggressive" and "cussed at staff." The staff called law enforcement, who removed Mother from the hospital. An entry in David's medical records following this visit states, "[b]aby is now on no info. Do not give any updates to any family member of the baby. Baby cannot have any visitors at this time. . . . Do not [discharge] the baby to anyone in the family. Anticipated dispo is removal to CPS custody."

## E.    The Department's involvement

On the day David was born, the Department received a report that Mother had tested positive for amphetamines. The next day, a Department investigator visited the hospital where David was born. A hospital social worker told the investigator that David had been born prematurely, that he was "cranky and sweaty," and that Mother had tested positive for amphetamines. The social worker also told the investigator that Mother threatened to leave with David, that hospital

14

security was monitoring David twenty-four hours a day, and that David would not be discharged with Mother.

The investigator tried to speak with Mother while she was still in the hospital, and Mother became "irate." Mother told the investigator she "hates" the Department and asked the investigator to leave. The investigator told Mother it was not the Department's intention to take David, but they needed to speak with her about a care plan and any available family support. The investigator also asked Mother to take a drug test, which she refused.

The investigator began looking for a "safety monitor" to assist Mother with caring for David upon his discharge from the hospital. A safety monitor is someone from outside the home, typically a family member or close friend, whom the Department puts in place to supervise interactions between a parent and child. The investigator initially identified Mother's sister as someone to fill this role, but her sister had been banned from the NICU for "verbally assaulting" a nurse, was "in and out of jail," and could not pass a background check. The investigator then asked Mother's father and his wife if they would become involved.

While Mother's father and his wife were willing to take David into their home, Mother would not agree to that arrangement and "refused to cooperate with the [Department]." But because Mother still had conservatorship over David at that point, the Department needed Mother's consent before it could place him with

her father. Accordingly, on the same day Mother threatened to take David from the NICU, the Department filed this suit to terminate Mother's and Father's parental rights and for emergency orders placing David in its temporary conservatorship. The Department's petition named Father as David's alleged father. After an emergency hearing, the trial court granted the emergency orders and set the matter for a full adversary hearing. *See* TEX. FAM. CODE § 262.201. After the full adversary hearing, the trial court placed David in the Department's conservatorship pending trial.

With David now in the Department's conservatorship, it placed him with Mother's father and his wife upon David's discharge from the hospital. The Department's investigator described the couple as a "nice, loving family" who "wanted to do whatever they needed to do to help [Mother]" and were "glad to have their grandbaby." They "wanted to do whatever they needed to do to make sure that that child did not go into State's custody [or] . . . foster care."

But after David had been with them only a short time, Mother's father and his wife asked that David be removed from their home and placed in foster care due to Mother's actions and those of Mother's mother. According to the Department's investigator, Mother was "irate" that David had been placed with her father and his wife, and she and her mother "harassed and threatened" them while David was in their care. Mother "accused the State of killing her baby and she

16

accused her father of killing her child and she stated she was coming over to take her baby." The harassment became so severe that Mother's father and his wife filed a police report, and, despite their initial intention of preventing it, they ultimately asked that David be "placed in foster care so they can have peace in their home." The Department placed David in foster care with an unrelated family.

## F.     Mother's and Father's service plans

In addition to giving the Department conservatorship of David during the pendency of suit, the trial court ordered Mother and Father to comply with the Department's service plans. Mother's service plan set multiple goals, including that Mother be drug free with stable housing and employment, that David be in a safe environment, and that Mother "accept the agency's help and do the work to regain custody of [David]." The plan required Mother to, among other things, provide proof of stable income and housing, complete a substance abuse assessment, submit to random drug tests, and complete parenting classes.

Several months later, the trial court conducted a status hearing and adopted the plan as an order of the court, finding that "the goal of the service plan is to return [David] to the Parents." The trial court also found that, as of that point, Mother "ha[d] not demonstrated adequate and appropriate compliance with the service plan."

17

When David was a little over one year old and living with his foster family, the Department scheduled a family group conference, which Mother and Father attended. There, they told the Department they would not be participating in any of its services. Despite the Department's efforts to set up visitations, Mother did not visit David at any time during this period, nor did she ask about his well-being, request a picture of him, or discuss any future plans for David.

Over the next several months, the trial court conducted a series of permanency hearings. At each of them, it found that neither Mother nor Father was in compliance with their service plans.

The Department later filed a permanency report with the trial court. The report detailed Mother's and Father's lack of cooperation and failure to comply with their service plans. Although the Department's original goal was for Mother and David to be reunited, the permanency report stated that the Department's permanency goals for David had become "unrelated adoption" and "unrelated conservatorship." At trial, the Department's caseworker testified that she believed it would be in David's best interests to terminate Mother's rights because of Mother's substance abuse.

## G. The Department's efforts to maintain contact with Mother and Father

Throughout the time it had conservatorship of David, the Department had difficulty maintaining contact with Mother and Father. A few months after David

18

was born, a Department caseworker contacted Father's wife by telephone, after which Father called the caseworker. Father told the caseworker he would take a DNA paternity test, but when the caseworker attempted to follow up with him, Father did not respond. The caseworker contacted the DNA testing facility, but it did not have any records that Father had ever been tested.

After this initial contact with Father, the Department lost contact with both Mother and Father for the next year. During that time, the Department attempted to reach out to each of them through the telephone, social media, friends and relatives, and monthly letters. Neither Mother nor Father responded. A Department caseworker also contacted Mother's attorney to schedule a meeting, but the attorney said Mother declined the invitation.

## H. David's foster family

When Mother's father and his wife could no longer care for David after being harassed by Mother, the Department placed David with an unrelated foster family. David was two months old. He was still with the foster family when trial began and was eighteen months old. Both foster parents testified at trial.

Before David was placed with them, foster mother and foster father completed training to become certified foster parents. When they received news David would be placed in their home, foster mother was in California but took an overnight flight home to be there when David arrived the following morning.

19

David's medical condition required more attention than that of a typical two-month-old. Foster mother took leave from work so she could care for him around the clock. David was "very, very congested," like he had "a never-ending bad cold," and the foster parents obtained "everything that we could think of, like a humidifier to make him comfortable." They had to give David "extra care just to make sure that he was breathing correctly," including aspirating his nose every thirty minutes. In addition to his regular medical appointments, they took David to appointments to monitor his potential syphilis infection, for which he first tested as nonreactive shortly before trial. And while David was "very small" when initially placed with the foster parents, he had reached a "great weight" by the time of trial.

The foster parents developed a successful daily routine for David and are making plans for his education. Foster mother testified that David enjoys playing with other children and is "a very happy, amazing young boy." The Department's caseworker made similar observations, testifying that David had bonded with his foster mother and father and is "full of joy."

## I. Trial and decrees of termination

After significant pretrial proceedings, the case was tried in February 2025. The trial was bifurcated, with the case to terminate Father's parental rights tried to the bench and the case to terminate Mother's rights tried to a jury. Neither Mother

nor Father was present during any portion of either trial. As discussed below, Mother's counsel orally moved for a continuance of trial, which was denied.

At the conclusion of the bench trial, the trial court terminated Father's parental rights to David. At the conclusion of the jury trial, the jury found the Department had proved, by clear and convincing evidence, multiple grounds for the termination of Mother's parental rights. The trial court entered a final decree terminating Mother's parental rights to David based on the jury's verdict. Mother and Father appeal.

## II. Termination of Mother's Parental Rights

### A. Denial of Mother's oral motion for a trial continuance

Mother first contends the trial court abused its discretion by denying her request for a continuance of trial.

#### 1. Relevant trial-court proceedings

Trial was set to begin at 9:00 a.m. on February 10, 2025. At 9:37 a.m., the trial court asked for appearances of counsel and noted, "Parents are not present." After entertaining arguments from counsel about whether their absence effected a waiver of Mother's jury demand, the trial court said, "jury trial was docketed to start at 9 o'clock, it is now 9:40 and still no client?" The trial court asked Mother's counsel whether he wished to proceed with a jury trial notwithstanding Mother's absence, to which counsel responded, "[M]y client's clear marching orders were

21

that she wants a jury trial, so I have to stand on that position." The trial court then granted a brief recess to consider the waiver issue.

When the trial court returned, it announced that a venire "panel of 43 should be here in just a moment" and ruled that "[w]e will go forward on Mother's portion." Before proceeding on Mother's case, and as discussed in detail below, the trial court conducted a bench trial of the termination of Father's and unknown father's parental rights. The transcript does not contain time stamps, but this bench trial portion of the proceedings takes up about twelve pages of the transcript.

Mother had not arrived by the time the bench trial concluded. Her counsel reported to the trial court that co-counsel had spoken with Mother by telephone and Mother's car was not working, meaning she was unable to come to the courthouse. Mother's counsel then made an oral motion for "a reset or delay." The trial court asked whether Mother had considered alternative means of transportation such as a rideshare service, public transportation, or from a friend. Co-counsel responded that she had not asked those questions during the call with Mother because Father's bench trial was ongoing and she was "trying to calm [Mother] down a little bit."

At that point, the trial court noted it was 10:00 o'clock and said the "jury should be on the floor any minute now." The trial court recognized that "we're set for a jury trial" and "everyone is ready to go," that trial was scheduled to start at 9:00 a.m., and that "[Mother is] just now calling counsel," meaning "she's still an

hour late." The court continued by saying the delay "certainly puts the court and just taxpayers in a predicament. Car broke down today. It could be something else tomorrow. At what point is the burden on the parent to get to court for the termination of their parental rights? And we also have the jury in the hallway." The trial court granted another recess for counsel to call Mother and determine if she planned to arrive, "and then we'll go ahead and go forward."

After the recess, Mother's co-counsel reported Mother was unwilling to waive her jury demand. Co-counsel told the trial court, "[Mother] is going to try and get here when she can. She's having car problems and maybe having panic issues." When the trial court asked whether Mother had offered a plan to get to the courthouse, "whether it is public transportation, whether it's Uber, whether it's a friend," co-counsel responded, "I threw out options and she said I'm trying, I'm trying. She was crying."

The trial court then heard arguments on a motion in limine and regarding exhibits, after which the venire panel was brought into the courtroom and voir dire began. Mother did not appear for trial that day. Mother also did not appear during the trial's second day, and her counsel offered no reason why Mother did not attend that day.

## 2. The trial court did not abuse its discretion by denying Mother's motion for continuance

We review a trial court's denial of a motion for continuance for abuse of discretion. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 800 (Tex. 2002). A trial court abuses its discretion when it acts in an arbitrary and unreasonable manner. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). If a motion for continuance does not comply with Texas Rule of Civil Procedure 251, we presume the trial court acted within its discretion in denying the motion. *In re L.S.*, No. 01-24-00106-CV, 2024 WL 5160515, at *9 (Tex. App.—Houston [1st Dist.] Dec. 19, 2024, no pet.) (mem. op.) (citing *In re E.L.T.*, 93 S.W.3d 372, 375 (Tex. App.—Houston [14th Dist.] 2002, no pet.)).

Rule 251 requires that an opposed application for continuance be "supported by affidavit." TEX. R. CIV. P. 251. The record does not indicate Mother filed an affidavit, any verification, or any form of written motion, even though trial continued for two days after her counsel made an oral motion for continuance. In the absence of an affidavit from Mother, we presume the trial court acted within its discretion in denying the motion. *See id.*; *In re R.F. III*, 423 S.W.3d 486, 490 (Tex. App.—San Antonio 2014, no pet.) (no abuse of discretion where trial court denied motion to continue trial of parental rights termination case because parent failed to "file[] a written motion for continuance, much less a verified motion or an affidavit").

Mother argues that the trial court's denial of her motion for continuance was "unreasonable" because the motion was not made in bad faith, granting it would not have prejudiced the Department, and denying it prejudiced her. But Mother cites no authority supporting that the trial court abused its discretion by denying Mother's oral motion for continuance under these circumstances in which Mother missed two days of trial and never (whether before, during, or after trial) provided evidence establishing the reasons she was unable to attend trial. As the trial court pointed out, Mother failed to call her counsel to report that she was having car trouble until after trial was scheduled to begin. The trial court delayed the start of trial for at least an hour after its scheduled start time while it dealt with other issues, during which time Mother did not arrive. The trial court took two recesses to allow Mother's counsel to call her to develop a plan for getting to the courthouse, each time suggesting alternative means of transportation. After each of those recesses, Mother's counsel was unable to provide Mother's estimated arrival time or an assurance that she would be there at all, and counsel did not offer any details about the nature of Mother's car troubles, such as whether they involved something that had arisen that morning, like a flat tire on the way to the courthouse, or a problem that had arisen days or weeks before and was left to linger. And Mother failed to arrive at any point during the two-day trial. *See Zarsky v. White*, 704 S.W.3d 211, 221 (Tex. App.—Houston [14th Dist.] 2022, pet.

25

denied) (where litigant was not present on first day of trial and counsel requested continuance, but litigant also failed to appear for second day of trial, "granting the requested one-day continuance would have made no difference").

We conclude Mother has not rebutted the presumption that the trial court acted within its discretion in denying her motion. *See In re C.F.*, 565 S.W.3d 832, 844 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) ("When a motion for continuance does not comply with the rules—for example, when the motion is unwritten or unsupported by verified facts—appellate courts generally presume the trial judge did not abuse its discretion in denying the motion."); *In re Guardianship of Cantu de Villarreal*, 330 S.W.3d 11, 26–27 (Tex. App.—Corpus Christi–Edinburg 2010, no pet.) ("[A] trial court is not required to grant a motion for continuance just because a party is unable to be present at trial."). We overrule Mother's first issue.

B.    **Sufficiency of the evidence supporting termination of Mother's parental rights**

In her second through eighth issues, Mother contends there was legally and factually insufficient evidence to support the jury's findings that there were grounds for termination of her parental rights under the Texas Family Code and that termination was in David's best interest. *See* TEX. FAM. CODE § 161.001(b).

### 1. Standard of review

We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). But "the rights of natural parents are not absolute," "protection of the child is paramount," and "[t]he rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003).

To terminate parental rights under the Family Code, the Department must establish by clear and convincing evidence that (1) a parent committed one or more statutorily enumerated predicate acts or omissions, and (2) termination is in the child's best interest. TEX. FAM. CODE § 161.001(b)(1)–(2); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012). Clear and convincing evidence is "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007. "This heightened burden of proof affects the standard of review in an evidentiary challenge on appeal." *In re J.W.*, 645 S.W.3d 726, 741 (Tex. 2022).

Due to the elevated burden of proof in a termination suit, we do not apply the traditional formulations of legal and factual sufficiency on appeal. *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). In a legal-sufficiency review in a termination case, we cannot ignore undisputed evidence contrary to a finding, but we must

otherwise assume the factfinder resolved disputed facts in the finding's favor. *Id.* at 630–31. The evidence is legally insufficient if, viewing all the evidence in the light most favorable to a finding and considering undisputed contrary evidence, a reasonable factfinder could not form a firm belief or conviction that the finding is true. *Id.* at 631.

In a factual-sufficiency review, we must weigh disputed evidence contrary to a finding against all the evidence in the finding's favor. *Id.* The evidence is factually insufficient if, in view of the entire record, the disputed evidence a reasonable factfinder could not credit in the finding's favor is so significant that the factfinder could not have formed a firm belief or conviction that the finding is true. *Id.*

In reviewing for evidentiary sufficiency, we must not usurp the factfinder's role. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014). Deciding whether and to what degree to credit the evidence is the factfinder's role, not ours. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). The factfinder is the sole arbiter of witness credibility. *Id.*

### 2. Predicate finding under section 161.001(b)(1)

The first element the Department must prove to terminate parental rights is that one of the predicate grounds for termination set forth in Family Code § 161.001(b)(1) is satisfied. Based on the jury's findings, the trial court terminated

28

Mother's parental rights under the predicate grounds in section 161.001(b)(1)(D), (E), (N), (O), (P), and (R). Generally, only one predicate ground and a best interest finding are necessary for termination, so we need consider only one predicate ground if we determine the evidence is sufficient to support that ground. *In re M.P.*, 639 S.W.3d 700, 702 (Tex. 2022); *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019). However, we may not bypass challenges to the sufficiency of the evidence to support findings under sections 161.001(b)(1)(D) and (E)—the "so-called endangerment grounds"—because those grounds can serve as a ground for termination of a parent's rights to another child. *In re J.W.*, 645 S.W.3d at 748; *In re M.P.*, 639 S.W.3d at 704; *see also* TEX. FAM. CODE § 161.001(b)(1)(M). Accordingly, we will begin with Mother's challenge to the jury's finding under section (E).

Section (E) provides a predicate for termination if the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]" TEX. FAM. CODE § 161.001(b)(1)(E). To "endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 616 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). A child is endangered if his environment creates a potential for danger

29

that the parent disregards. *In re N.J.H.*, 575 S.W.3d 822, 831 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).

For instance, "[i]ntentional criminal activity that exposes a parent to incarceration is conduct that endangers the physical and emotional well-being of a child." *In re V.V.*, 349 S.W.3d 548, 554 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (en banc). Furthermore, abusive and violent criminal conduct by a parent can produce an environment that endangers a child's well-being, and evidence that a person has engaged in such conduct in the past permits an inference that the person will continue violent behavior in the future. *Jordan v. Dossey*, 325 S.W.3d 700, 724 (Tex. App.—Houston [1st Dist.] 2010, pet. denied); *Walker*, 312 S.W.3d at 617.

Although "mere imprisonment will not, standing alone, constitute engaging in conduct which endangers the emotional or physical well-being of a child, . . . incarceration does support an endangerment finding 'if the evidence, including the imprisonment, shows a course of conduct which has the effect of endangering the physical or emotional well-being of the child.'" *In re J.F.-G.*, 627 S.W.3d 304, 312–13 (Tex. 2021) (quoting *Boyd*, 727 S.W.2d at 533–34). Thus, a

"parent's criminal history—taking into account the nature of the crimes, the duration of incarceration, and whether a pattern of escalating, repeated convictions exists—can support a finding of endangerment." *Id.* at 313.

Additionally, "a parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." *In re J.O.A.*, 283 S.W.3d at 345. "Because it significantly harms the parenting relationship, drug activity can constitute endangerment even if it transpires outside the child's presence." *In re N.J.H.*, 575 S.W.3d at 831. This does not require a parent's drug use to directly or physically harm the child; "a pattern of parental behavior that presents a substantial risk of harm to the child permits a factfinder to reasonably find endangerment." *In re R.R.A.*, 687 S.W.3d 269, 278 (Tex. 2024). A parent's "decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being." *In re N.J.H.*, 575 S.W.3d at 832 (internal quotations omitted).

"Termination under subsection (E) must be based on more than a single act or omission." *Id.* at 831. A parent's conduct prior to the child's birth and either before or after the child's removal by the Department may be considered. *Walker*, 312 S.W.3d at 617. Offenses occurring prior to the child's birth can be considered as part of a voluntary, deliberate, and conscious course of conduct that has the

31

effect of endangering the child. *Id.* "[A] parent's past endangering conduct may create an inference that the past conduct may recur and further jeopardize the child's present or future physical or emotional well-being." *In re J.D.G.*, 570 S.W.3d 839, 851 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). It is not necessary for the Department to establish that a parent intended to endanger the child. *Id.* And the endangering conduct need not have occurred in the child's presence. *Walker*, 312 S.W.3d at 617.

### 3. Sufficiency of the evidence supporting 161.001(b)(1)(E) finding

The Department presented evidence regarding Mother's conduct endangering David's physical and emotional well-being while she was pregnant with him, shortly after his birth, and during the pendency of this case, as well as evidence of her criminal history and history with the Department relevant to the endangerment issue.

#### a. Evidence of endangerment during pregnancy

The evidence shows that during her pregnancy with David, Mother:

- tested positive for amphetamine use.

- admitted to using marijuana.

- admitted to selling methamphetamines as a source of income.

- refused to speak with David's neonatologist about his medical needs (or her own), notwithstanding that that the doctor was attempting to tell Mother David could be born with complications that could require

32

him to be put on respiratory support, have a breathing tube installed, or undergo a spinal puncture.

- gave birth to David, who immediately experienced drug-withdrawal symptoms.

- failed to obtain proper prenatal care, resulting in Mother's undiagnosed case of syphilis that placed David in danger of contracting congenital syphilis and caused him to be born at a low weight.

These acts and omissions can endanger a child's physical or emotional well-being. *See, e.g.*, *In re H.M.Q.*, No. 01-24-00817-CV, 2025 WL 1033755, at *7 (Tex. App.—Houston [1st Dist.] Apr. 8, 2025, pet. filed) (mem. op.) ("It is settled Texas law that a mother's use of illegal drugs during pregnancy endangers the physical wellbeing of her unborn child."); *In re Z.Q.N.*, No. 14-17-00434-CV, 2019 WL 758377, at *9 (Tex. App.—Houston [14th Dist.] Feb. 21, 2019, pet. denied) (mem. op.) ("A mother's failure to seek prenatal care is relevant to the endangerment analysis."); *Walker*, 312 S.W.3d at 617 ("Because it exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under section 161.001[(b)](1)(E).").

Mother did not offer contrary evidence; instead, her arguments on appeal focus solely on attacking the sufficiency of the Department's case. First, Mother contends the only witness to her admission of selling methamphetamines was the Department's investigator, whose testimony "was questionable and lacked credibility." That is incorrect. The record also contains a doctor's note from

33

Mother's admission to the hospital providing that Mother "stated that she sells Meth as a form of income but denies any usage." Similar statements are also found in the Department's removal affidavit. And even if Mother believes the investigator's testimony was "questionable," the jury was the sole judge of the investigator's credibility and free to believe her. *In re J.O.A.*, 283 S.W.3d at 346.

Mother also challenges the Department's reliance on her positive amphetamine test, pointing to the following statement on the drug-screen results, "Drugs reported as positive have not been confirmed by a second method and should be used for medical purposes only," and the neonatologist's testimony that she was not sure whether a second confirmatory test was performed. But Mother does not dispute that she tested positive for amphetamines or admitted to smoking marijuana while pregnant, and the Department's investigator testified that Mother refused her request to consent to another drug test. Moreover, the fact that David was born with withdrawal symptoms corroborates Mother's use of the drug while pregnant. A reasonable jury could find that the lack of a second, confirmatory drug test did not diminish the probative value of Mother's positive amphetamine screen or her admission that she used illegal drugs while pregnant. *See In re A.J.D.-J.*, 667 S.W.3d 813, 825 (Tex. App.—Houston [1st Dist.] 2023, no pet.) ("She failed to appear for any further drug tests, which is a circumstance from which the factfinder could have reasonably found that she continued to use illegal

34

drugs and refused to submit to further testing to avoid confirmation of this unfavorable fact.").

Mother argues the evidence that David suffered from withdrawal symptoms is "severely lacking." But Mother's hospital records reflect that, shortly after birth, David began suffering from "exposure to maternal THC and amphetamines with mild clinical withdrawal symptoms." Although David did not test positive for amphetamines, the neonatologist confirmed she had "no doubt" that David "exhibited withdrawal symptoms from some illicit drug." The neonatologist testified that David was "very agitated, very fussy, increased tone, heartrate was up, difficult to console," which are signs of withdrawal. She further explained it would be possible for David to test negative for amphetamines even if Mother had used them, because Mother could have used them more than two days before David's birth, or used only small amounts of the drug, neither of which would have shown up in tests of David's urine or meconium. The neonatologist testified Mother's use of amphetamines during pregnancy was "endangering conduct" and there is no amount of an illicit drug that is safe for a pregnant woman to ingest. The record likewise contains a note from the hospital's social worker stating that David's pediatrician reported the "child is going through withdrawal symptoms," as well as a note by a nurse practitioner that "[w]ithin 12hr after admission, infant

started to be very fussy, not sleeping, sneezing, congestion/stuffiness, jittery with increased tone."

Mother also argues the Department's theory of her lack of prenatal care was "just an assumption and not based on supporting evidence." But the medical records from Mother's hospital stay state her prenatal care was "scant" and her pregnancy was complicated by this lack of care. The neonatologist testified she considered David's exposure to syphilis to be "the most concerning part of this case" and "endangering conduct" because of Mother's "very, very limited prenatal care" and the long-term harm congenital syphilis can cause to a baby without prenatal care. *See In re S.V.*, No. 07-16-00279-CV, 2016 WL 7634473, at *2 (Tex. App.—Amarillo Feb. 16, 2017, pet. denied) (mem. op.) ("Other instances of J.H. endangering D.V. included foregoing prenatal care.").[4]

### b.  Evidence of endangerment shortly after David's birth

The Department presented evidence of Mother's endangering conduct shortly after David was born:

- Mother, while still in the hospital, was visited by a hospital social worker to discuss her positive drug screen and became "irate,"

---

[4]  Mother contends David's syphilis exposure does not support the jury's endangerment findings because "there was no evidence that Mother was even aware she had syphilis," and thus, she could not have knowingly exposed David to the disease. But the question is not whether Mother endangered David's well-being by knowingly exposing him to syphilis; the question is whether Mother endangered David by failing to obtain the proper prenatal care that could have detected and treated her condition and thus prevented David from being exposed.

36

removed her monitoring lines, and threatened to take David from the NICU and leave the hospital with him against medical advice, causing the hospital to install security guards to prevent Mother from taking David.

- After Mother was discharged from the hospital, she returned to the NICU at 11:15 p.m. one night, demanded that someone "needs to come talk to me" about why David remained in the NICU when "he's doing so well," and became "increasingly agitated" at the presence of the security guard. Hospital staff observed that "Mother's gait was unstable," "she was jittery," and "her voice kept cracking as she spoke."

- Mother attempted to return to the NICU a few nights later and, after being told she would not be allowed to visit David, "became aggressive and cussed at staff," resulting in the police being called to remove Mother from the hospital.

- Mother refused to take a drug test when the Department asked her to do so.

- Mother refused to speak with the Department's investigator to discuss a plan to care for David after he left the hospital and "formulate a plan to help [Mother] stay united with her child."

The neonatologist testified that Mother's threat to disregard medical advice and take David from the NICU while he was still undergoing treatment was "absolutely" "endangering conduct by [Mother]" because "babies who have untreated syphilis would have long-term consequences." *See D.H. v. Tex. Dep't of Family & Protect. Servs.*, 652 S.W.3d 54, 60 (Tex. App.—Austin 2021, no pet.) ("The failure to provide or obtain appropriate medical care for a child can constitute endangering conduct under subsection (E).").

37

### c. Evidence of endangerment during the pendency of this case

The Department also presented evidence that Mother endangered David's well-being during the pendency of this case:

- Mother failed to maintain contact with the Department for about a year after David was placed in the Department's conservatorship, despite the Department's regular attempts to contact Mother through calls, social media, letters, and Mother's friends and family.

- Mother told the Department she was not participating in any of its services, including substance abuse programs and parenting classes intended to work toward a reunification with David.

- Mother failed to follow the court-ordered family service plan and to complete any of its services, whereas participation in those services may have led the Department to attempt to reunify Mother with David.

- Mother generally refused to cooperate with the Department, at one point declining a meeting with Department representatives when they attempted to schedule one through her counsel.

- Mother harassed her father and his wife after David had been placed with them, to the point that they called law enforcement and asked the Department to remove David from their home and place him with an unrelated foster family.

- Mother did not ask about David's well-being at any time during the Department's conservatorship, did not inquire about the status of his health, and did not request a photograph of him.

- Mother declined the opportunity to visit David at any time while he was in the Department's conservatorship, despite having the option for two visits each month.

These acts and omissions support an endangerment finding. *See, e.g*, *In re Z.J.G*, No. 01-24-00894-CV, 2025 WL 1129130, at \*9 (Tex. App.—Houston [1st

38

Dist.] Apr. 17, 2025, pet. denied) (mem. op.) ("Mother and Father's repeated refusals to participate in drug testing . . . are evidence of ongoing drug use. . . . We have also held that a parent's failure to complete drug treatment as required by a Family Plan of Service can be reasonably interpreted as evidence that the parent would continue to use illegal drugs and endanger the child's future."); *In re A.J.A.D.*, No. 01-22-00521-CV, 2022 WL 17813763, at *7 (Tex. App.—Houston [1st Dist.] Dec. 20, 2022, pet. denied) (mem. op.) ("While child abuse is a prominent feature of many decisions addressing endangering conduct, mere neglect can be just as dangerous to a child's physical and emotional wellbeing. . . . [P]rolonged lack of contact or absence from a child's life qualifies as endangering conduct.").

Mother argues the record lacks evidence of any "recent behavior" by her to support an endangerment finding. We reject this argument because Mother's aforementioned conduct occurred after this case had been filed, and her neglect of David continued until the time of trial.

### d. Evidence of endangerment based on Mother's criminal history and history with the Department

The Department also presented evidence of Mother's criminal history and history with the Department, both of which support the jury's endangerment findings. *See In re K.H.G.*, No. 01-23-00675-CV, 2024 WL 1098202, at *11 (Tex. App.—Houston [1st Dist.] Mar. 14, 2024, no pet.) (mem. op.) ("[T]he jury was

permitted to consider evidence of Mother's neglect or endangerment of Bobby, Mother's first child, to support a finding that Mother endangered Kevin's well-being."); *D.H.*, 652 S.W.3d at 59 ("[I]n evaluating whether the evidence supports a finding of endangerment under subsection (E), the factfinder may consider conduct that occurred both before and after the child was born[.]").

Between 2003 and 2013, Mother was adjudicated for or convicted of four crimes and received deferred adjudication for another, namely for aggravated robbery, robbery, theft, credit-card abuse, and assault on a family member. In 2016, she was charged with drug possession after police were called to investigate a drive-by shooting at a residence where Mother was present. The drug possession charges against Mother were dropped when her co-defendant was convicted.

The Department investigated at least six reports of Mother's abuse or neglect of her other children prior to having David:

- In 2011, the Department received a report that Mother was using drugs and not properly caring for her one-year-old child.

- In 2015, after the Department received a report that Mother's drug use was "getting worse" and she was using and selling drugs in the home where she lived with her children, Mother admitted during the ensuing investigation to using marijuana, Xanax, and cocaine, and she tested positive for marijuana, cocaine, amphetamines, methamphetamines, and benzodiazepines. At the conclusion of its investigation, the Department removed Mother's children from the home and placed them with a relative.

- Six months later, the Department received a report that Mother and a five-month-old child in her care were passengers in a car that was

pulled over for speeding at ninety-two miles per hour, and the police found illicit drugs and drug paraphernalia in the car. During the Department's investigation of this incident, Mother apparently took steps to avoid the investigators.

- In 2020, the Department investigated a report that another of Mother's children had been sexually abused by an unrelated house guest while staying in the child's father's house. The Department closed its case after its attempts to interview Mother about the incident were unsuccessful.

- In 2021, the Department received a report that Mother was again "using a lot of drugs," that she and her child were living in an abandoned house with no utilities, and that the child often went without food while Mother went in search of drugs.

- In 2022, the Department received another report that Mother and her five-year-old child were living in an abandoned house with no running water, where Mother was selling and using methamphetamines.

Mother responds that, although her other children were removed from her care, her rights to them were not terminated. She also contends that the firearms found during the investigation of the drive-by shooting do not support an endangerment finding because Mother has the right to possess firearms and there was no evidence they were improperly or unsafely stored.

These arguments lose sight of the totality of the evidence. Although Mother's parental rights to her older children were not formally terminated, a court nonetheless found it necessary to remove the children from her care and place them

41

with a relative, due in part to Mother's admitted drug use.[5]  And before she could visit her children, the court's order in that case required that Mother test negative for drugs in staged testing over a nine-month period.  But just six months later, Mother and a five-month-old child in her care were passengers in a vehicle where drugs and drug paraphernalia were found when the car was pulled over for speeding.  And for the next several years after that, the Department continued to receive reports of Mother's drug use while a child was in her care, ultimately leading Mother to live with the child in abandoned houses with no electricity or running water.  The record as a whole demonstrates that Mother has a history of illicit drug use that resulted in her children being removed from her care, yet she continued to be involved with illegal drugs, including when pregnant with David, and refused drug testing during the pendency of this case.  A reasonable jury could form a firm belief or conviction that such conduct created an endangering environment.  *See In re N.K.*, 399 S.W.3d 322, 331 (Tex. App.—Amarillo 2013, no pet.) (recognizing an "environment which routinely subjects a child to the

---

[5]     The record does not disclose why the trial court made Mother a possessory conservator, rather than terminating her parental rights, in the prior case involving her older children.  Mother's argument about her prior case is thus "based on the absence of evidence about another case," which is "fundamentally at odds with the Department's burden of proof and our standards of review on appeal."  *In re A.J.D.-J.*, 667 S.W.3d at 831 ("Our evidentiary-sufficiency review cannot rest on unsupported assumptions about matters outside the appellate record. . . . And even if we knew such details, we do not know what, if any, role the mother has played in the lives of the two daughters after she was made their possessory conservator.").

probability that she will be left alone because her parents are once again jailed" due to drug use endangers well-being of the child).

Similarly, the absence of evidence that Mother improperly stored the weapons that were found when police investigated the drive-by shooting is immaterial. Mother was at the house with gang members and convicted felons when the shooting occurred, one of whom returned fire. When the police investigated, they found bullet holes in the side of the house, bullet casings inside and outside the house, guns under a mattress, and illegal drugs in plain view. A jury could reasonably find that such evidence is additional proof of Mother's propensity to put herself in situations that could lead to her child being left alone due to Mother's incarceration (or death).

### e. Summary

In sum, the Department presented evidence that Mother engaged in conduct that endangered David's well-being during her pregnancy with him, during the first few days after his birth, throughout the pendency of this case, and based on her history before his birth. Viewing all the evidence in the light most favorable to jury's findings, and considering undisputed contrary evidence, there was legally sufficient evidence for the jury to form a firm belief or conviction that Mother violated section 161.001(b)(1)(E). We also conclude that the evidence is factually sufficient because, in view of the entire record, the disputed evidence the jury

43

could not credit in its findings' favor was not so significant that jury could not have formed a firm belief or conviction that the findings are true. We overrule Mother's third issue.[6]

### 4. Sufficiency of the evidence supporting the best-interest finding

In her eighth issue, Mother contends the evidence was legally and factually insufficient to support the jury's finding that termination of her parental rights was in David's best interest. *See id.* § 161.001(b)(2). The best-interest inquiry is separate and distinct from the analysis of whether there are predicate grounds for termination. *See id.*; *In re S.R.L.*, 243 S.W.3d 232, 235 (Tex. App.—Houston [14th Dist.] 2007, no pet.).

There is a strong presumption that the best interest of a child is served by keeping the child with his natural parent. *See In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE § 263.307(a).

Courts may consider the following non-exclusive factors in reviewing the sufficiency of the evidence to support the best-interest finding: (1) the desires of the child; (2) the present and future physical and emotional needs of the child;

---

[6] Because only one predicate ground is required to support termination under section 161.001(b)(1), we need not address Mother's second, fourth, fifth, sixth, and seventh issues challenging the other section 161.001(b)(1) findings. *See In re A.V.*, 113 S.W.3d at 362.

(3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). Evidence is not required on each factor to support a finding that terminating a parent's rights is in the child's best interest. *Id.* Evidence supporting termination under one of the predicate grounds listed in section 161.001(b)(1) can also be considered in support of a finding that termination is in the best interest of the child. *See In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

### a.    Parental indifference

Before turning to consideration of the *Holley* factors individually, we note that parental indifference supports a finding that termination of parental rights is in the child's best under every one of the *Holley* factors. *In re A.J.D.-J*, 667 S.W.3d at 823. When a parent has been uninvolved in her child's life because of a lack of interest or willingness to participate in childrearing, the parent-child bond is "fundamentally broken" and termination of parental rights is in the child's best interest. *Id.*

45

Here, the record contains substantial evidence from which the jury reasonably could have concluded that Mother was indifferent to David. She tested positive for amphetamines and admitted to smoking marijuana and selling methamphetamines while pregnant with David. She had limited prenatal care, exposing David to congenital syphilis and potential complications. In the days before David's birth, Mother refused to speak with David's neonatologist about David's health risks and the care he would need, saying a visit with the doctor would "interrupt her rest." After David was born, Mother refused to speak with both the hospital's social worker and the Department's investigator about her plans for caring for David and the resources that might have helped Mother discharge from the hospital with him. After David was in the Department's care, Mother failed to make any effort to work with the Department toward reunification, refusing to participate in the family services plan and failing to communicate with the Department for approximately one year while David was in its care. Perhaps most tellingly, Mother did not visit David at any time while he was in the Department's care, despite numerous opportunities for visits, failing to even ask about his well-being. "[W]e have long considered evidence of little or no contact with the child to be proof that weighs heavily in favor of a trial court's best-interest finding." *Id*. at 824 (citing *Walker*, 312 S.W.3d at 619–20).

The record thus contains significant evidence of Mother's indifference to David. *See In re V.V.*, 349 S.W.3d at 552 (termination was in child's best interest where child was never in father's care, father had no involvement with child during eighteen months after child was born, and there was no bond between them).

### b.     Individual *Holley* factors

Because Mother challenges the evidence regarding several of the *Holley* factors, we next consider them individually.

***Desires of the child.***  When a child, like David, is too young to address his desires, the factfinder may consider whether the child has bonded with the proposed adoptive family and is well cared for by them, and whether he has spent minimal time with his natural parent.  *In re S.R.*, 452 S.W.3d 351, 369 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

The Department's caseworker testified that David was "well bonded" with his foster parents and "full of joy" while living with them, and that David is "doing really good."  Likewise, the Department's program director testified that the foster parents are "taking care of [David's] physical and emotional needs" and will continue to do so, that David is meeting "all appropriate age milestones," and that there are "no concerns" with David while he is in their care.  By contrast, Mother had not visited with David since he came into the Department's conservatorship, and the program director testified David does not have a bond with Mother.  This

factor supports that termination of Mother's parental rights is in David's best interest. *See In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (desires-of-the-child factor weighed in favor of termination where fourteen-month-old was "well-cared for by her foster family," whereas biological mother had not seen child in year and had only two visits since being removed from her care).

***The child's needs, the parental abilities of those seeking custody, their plans for the child, and stability of the home.*** Because the second, fourth, sixth, and seventh *Holley* factors are interrelated, we consider them together. Again, the record indicates Mother has been indifferent to David throughout his life, whereas his foster parents have provided him with stability and permanence. The foster parents described the daily routines they established for David, the foods he eats, the ways in which they have structured their work schedules around caring for him, their plans for his education and socialization, the family support they have, and the trainings and parenting classes they have taken.

The record also contains evidence that David had unique medical needs. When David was born and throughout the first few months of his life, he was at a low weight and required significant medical attention as the result of syphilis exposure. But after eighteen months with his foster parents, those conditions had largely abated. Foster father testified David had reached a "great weight" and

48

tested as "non-reactive" for syphilis for the first time in January 2024, at which point he was approximately seventeen months old.

In contrast, the record contains no evidence that Mother can meet David's most basic needs. The only evidence that Mother has any income is an admission that she sells methamphetamines. There is little evidence in the record of Mother's current housing situation, other than testimony from the Department's caseworker that she attempted on two occasions to visit the house located at the address the Department has on file for Mother. The first time, Mother's mother answered the door, told the caseworker not to take pictures, and said she did not know Mother. The second time, a sign had been posted saying visitors would be shot. On neither occasion was the caseworker able to speak with Mother or view the inside of residence, and she testified that the house did not appear to be "safe and stable."

Mother contends this lack of evidence cannot be construed as affirmative evidence of an inability to provide David with adequate housing. But Mother's failure to provide the Department with information regarding her housing situation—despite being required to do so by her court-ordered service plan—again reflects her refusal to provide a safe environment in order to be reunited with him. We conclude the second, fourth, sixth, and seventh *Holley* factors support that termination is in David's best interest.

***Present and future danger to the child.*** A parent's past conduct is probative of her future conduct when evaluating the child's best interest. *See In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.). As we described above, Mother has a long history of illicit drug use that resulted in her older children being removed from her home. That pattern continued during her pregnancy with David, leading to the Department's involvement in this case. And after the Department got involved, knowing her parental rights to David were in jeopardy, Mother refused the Department's request for a drug test, made no effort to comply with her service plan, and generally declined to work with the Department to demonstrate that her drug use would not persist. Because the evidence shows Mother's history of drug use is unlikely to abate, we conclude the third *Holley* factor supports that termination is in David's best interest.

***Programs available to assist those seeking custody.*** As detailed above, Mother failed to complete any aspect of her service plan, refused to work with the Department or avail herself of any of its programs, and expressly declined all services the Department offered. Thus, while the record does not contain details about the programs that might be available to Mother in the future, her past conduct indicates she would not take advantage of whatever programs might exist.

In contrast, David's foster parents have been involved in such programs since before David came into their care. They took the steps necessary to become

certified as foster parents, including taking parenting classes, courses on how to provide appropriate medical care for David, and other trainings, and they said they would like to adopt David. The sixth *Holley* factor thus supports that termination is in David's best interest.

*Acts or omissions of parent indicating inappropriate parent-child relationship.* As explained above, the relationship between Mother and David is inappropriate in that the complete lack of a parent's involvement in a child's life is abnormal, particularly for a child so young. *See In re B.D.A.*, 546 S.W.3d 346, 361 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (holding young age of children at issue in case—four, five, and seven years old, respectively—made them mentally and physically vulnerable if left in custody of parent who is unable or unwilling to protect them or attend to their needs). This factor supports that termination is in David's best interest.

We conclude there is legally and factually sufficient evidence throughout the record to support the jury's finding that termination of Mother's parental rights is in David's best interest. We overrule Mother's eighth issue.

## C. Appointment of the Department as managing conservator

In her ninth issue, Mother contends the evidence was legally and factually insufficient to support the jury's finding that appointment of the Department as David's sole managing conservator is in his best interest. Because we have

51

overruled Mother's challenges to the trial court's decree terminating her parental rights, the decree divested her of legal rights and duties related to David and she lacks standing to challenge the appointment of the Department as David's conservator. *See In re N.E.*, No. 01-22-00739-CV, 2023 WL 2530197, at \*1 (Tex. App.—Houston [1st Dist.] Mar. 16, 2023, pet. denied) (mem. op.). We overrule Mother's ninth issue.

### III.    Termination of Father's parental rights

In a single issue, Father contends the trial court abused its discretion by denying him a jury trial.

### A.    Relevant factual and procedural history

The Department filed this suit in August 2023, when David was less than a month old. Father was personally served on August 21, 2023, and the return of service was filed with the trial court two days later, on August 23, 2023. The trial court conducted an adversary hearing later that month and appointed the Department as David's temporary managing conservator. The case remained in its pretrial phase for about the next year-and-a-half. During that time, Father made no attempt to visit or contact David and did not participate in any court proceedings.

The trial court set the case for trial in February 2025. The court conducted a pretrial hearing the week before trial began, which Father did not attend. At the hearing, the Department informed the trial court it wanted to proceed with

termination of Father's parental rights under sections 161.002(b)(1) and (3) of the Family Code. *See* TEX. FAM. CODE § 161.002(b)(1), (3). Father's counsel objected, saying he had met Father "for the first time" at a mediation held the week before and Father had said "he wanted to be in court when we went to trial." Father's counsel also asserted that Father said he "is the father and wants to establish paternity." The trial court announced it would "entertain the termination Monday [the first day of trial] should [Father] not appear for jury trial."

When trial began the following week, Father did not appear, and his counsel told the trial court he had not had any contact with Father that day. After hearing argument from the parties about whether the parents' failure to appear waived their right to a jury trial, the trial court announced it would proceed with Mother's case as a jury trial and try Father's case to the bench. Over Father's counsel's objection, the trial court called Father's case for a bench trial.

The only witness to testify at Father's trial was the Department's caseworker. The caseworker testified that Father had never tried to visit or contact David, and although she had made monthly attempts to contact Father, she only spoke to him twice. The caseworker also testified she conducted a search of the paternity registry, which indicated no one, including Father, had claimed paternity for David. At the conclusion of trial, the trial court terminated Father's parental

rights to David under section 161.002(b)(1) and (3). *See* TEX. FAM. CODE § 161.002(b)(1), (3).

## B.   Father's right to a jury trial

Father contends the trial court abused its discretion by denying his request for a jury trial. We review the denial of a jury demand for an abuse of discretion, considering the entire record. *See In re A.L.M.-F.*, 593 S.W.3d 271, 282 (Tex. 2019); *Mercedes-Benz Credit Corp. v. Rhyne*, 925 S.W.2d 664, 666 (Tex. 1996). "A refusal to grant a jury trial is harmless error only if the record shows that no material issues of fact exist and an instructed verdict would have been justified." *Halsell v. Dehoyos*, 810 S.W.2d 371, 372 (Tex. 1991); *Wheeler v. Wheeler*, No. 01-16-00642-CV, 2017 WL 3140027, at *2 (Tex. App.—Houston [1st Dist.] July 25, 2017, no pet.) (mem. op.) (same).

The trial court terminated Father's parental rights under sections 161.002 (b)(1) and (3), which provide the "rights of an alleged father may be terminated if: (1) after being served with citation, he does not respond by timely filing an admission of paternity or a counterclaim for paternity under Chapter 160," or "(3) the child is under one year of age at the time the petition for termination of the parent-child relationship or for adoption is filed and he has not registered with the paternity registry under Chapter 160." *Id.* § 161.002(b)(1), (3). This statute allows the trial court to "summarily terminate" the rights of an alleged father when the

54

elements are satisfied. *In re D.R.L.*, No. 01-15-00733-CV, 2016 WL 672664, at *11 (Tex. App.—Houston [1st Dist.] Feb. 18, 2016, no pet.) (mem. op.).

Father argues the trial court's denial of a jury trial harmed him because there were material fact questions regarding his termination under section 161.002(b)(1) that should have been decided by a jury. However, Father does not argue any fact questions existed as to his termination under section 161.002(b)(3), and in fact admits that the elements of this independent ground were satisfied. Hence, there were no issues of fact for a jury to determine relative to termination under section 161.002(b)(3), meaning a directed verdict in the Department's favor would have been proper under this ground. *See Cuadra v. Declaration Title Co.*, 682 S.W.3d 628, 633 (Tex. App.—Houston [1st Dist.] 2023, no pet.) (recognizing grounds for directed verdict). Under these circumstances, any alleged error in the trial court's refusal to grant Father a jury trial was harmless. *See Halsell*, 810 S.W.2d at 372; *Wheeler*, 2017 WL 3140027, at *2. We overrule Father's sole issue.

## IV.    Conclusion

We affirm the trial court's Final Decree for Termination.

Andrew Johnson
Justice

Panel consists of Justices Guerra, Guiney, and Johnson.